NOT DESIGNATED FOR PUBLICATION

No. 119,379

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STACEY SPEED,
*Appellant*,

v

JOE NORWOOD, Secretary of Corrections,
*Appellee*.


MEMORANDUM OPINION

Appeal from Ellsworth District Court; SCOTT E. MCPHERSON, judge. Opinion filed December 14, 2018. Affirmed.

*Bradley T. Steen*, of Law Office of B. Truman Steen, LLC, of Ellsworth, for appellant.

*Robert E. Wasinger*, legal counsel, of Department of Corrections, for appellee.


Before ARNOLD-BURGER, C.J., LEBEN and BRUNS, JJ.


PER CURIAM: Prison inmates have some due-process rights when prison officials enter disciplinary sanctions against them that take away either liberty or property interests. So Stacey Speed filed a court action challenging the administrative fine of $70 and loss of good-time credits entered as a sanction against him for violating prison rules.

The district court found no violation of Speed's due-process rights and denied Speed's claim. Speed has now appealed to our court.

1

We will begin with a review of the proceedings in the state prison system and in the district court. Because Speed makes claims that he wasn't allowed to call a necessary witness and that the evidence didn't support conviction on the administrative charges against him, we must start with the charges and the evidence presented.

In 2017, Paul Cory, a correctional officer at the Larned Correctional Mental Health Facility, cited Speed in a disciplinary report for violating several Kansas Department of Corrections (KDOC) regulations. Cory alleged that Speed (1) failed to register personal property as required by an administrative regulation, K.A.R. 44-12-201; (2) misused the KDOC telephone system, violating another regulation, K.A.R. 44-12-211 (2017 Supp.); (3) was present in an area without authorization, violating K.A.R. 44-12-503(a); (4) acted as an accessory to an offense, violating K.A.R. 44-12-1101; and (5) had dangerous contraband, prohibited by K.A.R. 44-12-901.

According to the report, Cory had been monitoring Speed's telephone conversations with Janet Flamik, during which they spoke about picking up money and where Flamik should go to pick up money. Cory also described how surveillance videos showed:

- Inmate Charles Townsend "jumping the West Unit fence and running west of the facility to pick up a bag of contraband that was dropped by Janet Flamik";
- an inmate entering the West Unit with a package dropped by Flamik;
- Speed "standing at the West Unit entrance appearing to distract the officer while the contraband entered";
- Speed walking with two other inmates—Charles Townsend and Livingston (whose first name isn't included in the appellate record)—"to the end of the 2nd floor south" and then showing "the locker at the end of 2nd floor south tipping up and going back down"; and

2

- Flamik "driving on the restricted access road behind [the facility] to drop the packages" on two different occasions.

Finally, the report said "[a] large amount of contraband was discovered under the same locker [that was being tipped back and forth]," and that Speed had two pairs of sunglasses and a $100 bill in his possession.

Speed asked for a disciplinary hearing at which evidence would be presented and pleaded not guilty. At the hearing, Cory testified about the allegations in his report. Another officer, Tania Zubia, testified about gathering Speed's property during the investigation.

After Cory and Zubia testified, the hearing officer gave Speed the chance to make statements and cross-examine any witnesses. Speed argued that he wasn't properly charged with failing to register his sunglasses because "'[he] can't be charged with something [he] can't buy.'" When the hearing officer asked Speed where he got the sunglasses, Speed replied, "'I suppose I don't know.'"

Then Speed addressed the charge for misusing KDOC telephones. According to the hearing report, Speed argued that his phone calls to Flamik "were for the intention to pick up money for the Islamic fund and to assist Ms. Flamik with her lawful business of selling Essential Oils." After that, Speed addressed the allegations that Flamik was dropping packages of contraband for Speed. He asked Cory several questions about how he identified Flamik as the person dropping the packages. Cory described the videos of a Ford Focus dropping packages at a place Speed had pointed to on a map he sent to Flamik. Speed said that he wasn't responsible for Flamik's actions when she wasn't visiting him in prison.

When Speed addressed the allegations of helping distract an officer so another inmate could bring in packages of contraband, Speed argued that he wasn't distracting the officer,

3

but that the officer called Speed because he needed to speak to Speed. Then Speed explained how inmate Livingston was operating a store at the prison and stored his goods underneath the locker being tipped up and down in the video.

After Speed made his statements, the hearing officer asked Cory to produce any evidence that supported his allegations against Speed. Cory summarized what the evidence, including each video or audio recording, contained. The hearing officer listened to the recordings and watched the surveillance videos, which he also summarized in his report.

The hearing officer found that it was more likely than not that Speed had committed the alleged violations. Speed was fined a total of $80; he also received 90 days of restricted privileges, 30 days of disciplinary segregation, and lost 90 days of good-time credit.

Speed appealed to the Secretary of Corrections, who denied the appeal, finding that the prison officials had substantially complied with facility procedures and that some evidence supported the conviction. Speed then filed a habeas corpus petition under K.S.A. 60-1501 alleging due-process violations because he didn't receive proper notice of his charges and there wasn't enough evidence to support his convictions, among other claims. In response, the Secretary moved to dismiss, arguing Speed's claims were meritless.

The district court held a hearing on Speed's petition, during which Speed appeared with his retained attorney. At the hearing, Speed's attorney presented his argument and submitted a letter to Flamik from the Larned Correctional Mental Health Facility as an exhibit. After the Secretary presented its argument in support of its motion to dismiss, Speed responded to the Secretary's position.

In its order, the district court declined to rule on Speed's charge for being present in a restricted area because the Secretary's attorney said that KDOC was going to dismiss that

4

allegation and return the $10 monetary sanction associated with it to Speed. After explaining that "its review in this matter [was] limited to the record of the Disciplinary Hearing and is not a de novo review," the court found that Speed was afforded due process based on the "some evidence" standard. Without providing detailed findings about the issues Speed raised in his petition, the court granted the Secretary's motion to dismiss, effectively denying relief to Speed.

ANALYSIS

Under K.S.A. 60-1501, an inmate confined in a Kansas prison may bring a writ of habeas corpus in the county where he or she is confined. *Johnson v. State*, 289 Kan. 642, 648, 215 P.3d 575 (2009). On appeal, we review a district court's decision in a habeas case to determine whether the district court's factual findings are supported by substantial evidence and are enough to support the court's conclusions of law. We review the district court's legal conclusions independently, with no required deference to the district court. *Rice v. State*, 278 Kan. 309, 320, 95 P.3d 994 (2004).

I. *Speed Was Not Deprived Due Process During the Disciplinary Proceedings.*

Speed claims he was denied due process because of a series of alleged errors committed by the hearing officer. Inmates do have due-process rights when deprived of a constitutionally protected liberty or property interest. *Hardaway v. Larned Correctional Facility*, 44 Kan. App. 2d 504, 504-05, 238 P.3d 328 (2010). Here, the disciplinary sanction deprived Speed of property, through the $70 of fines. It also deprived Speed of liberty, through his loss of 90 days of credit for good-time served. See *Sauls v. McKune*, 45 Kan. App. 2d 915, 920, 260 P.3d 95 (2011). So Speed had the right to court review of the process given to him in these proceedings. 45 Kan. App. 2d at 920.

5

But the level of process due an inmate differs from that in a criminal trial or a civil lawsuit: the inmate is entitled to only a minimal level of due process. *Superintendent v. Hill*, 472 U.S. 445, 455-56, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985); *Frost v. McKune*, 44 Kan. App. 2d 661, 662, 239 P.3d 900 (2010). The minimal procedures to which an inmate is entitled include written notice of the charges to enable the inmate to prepare a defense, an impartial hearing, the opportunity to call witnesses and present documentary evidence, and a written statement from the hearing officer on the findings and the reasons for the decision. *Swafford v. McKune*, 46 Kan. App. 2d 325, 329, 263 P.3d 791 (2011).

A. *Speed Received Adequate Notice of His Charges*.

Speed first argues that he was denied due process because he didn't have sufficient notice of his charges to be able to prepare a defense. He specifically claims he was deprived adequate notice for several reasons, including that

- the charges in the disciplinary report included video footage from six different dates, but of those dates only April 2, 2017, was alleged in the report;
- the disciplinary report didn't include the name of the corrections officer who witnessed Speed standing "'at the West Unit entrance appearing to distract the officer while the contraband entered'";
- the disciplinary report charging Speed with being an accessory didn't allege who the principal to the offense was;
- "the facts alleged in the report do not indicate what property he failed to register";
- the disciplinary report didn't state what specific illegal activity took place with regards to his "telephones" allegation; and
- the disciplinary report didn't say which confiscated item was "'dangerous contraband.'"

6

But all that's required for notice of charges to be adequate in KDOC disciplinary proceedings is that the prisoner receive advance notice of the charges against him, not a detailed recitation of all the underlying evidence. K.A.R. 44-13-101(a); see *Wolff v. McDonnell*, 418 U.S. 539, 563-64, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974); *Lynn v. Pryor*, No. 117,068, 2018 WL 2374862, at *8 (Kan. App. 2018) (unpublished opinion), *rev. denied* August 31, 2018. Indeed, Speed's disciplinary report does just that; it shows that Speed was charged with violating five different regulations and it summarizes the facts that support the allegations against Speed. Likewise, the disciplinary report explains what the officers purportedly observed on the audio and video recordings. We conclude, then, that Speed's disciplinary report gave him adequate notice of the charges so he could prepare a defense. See *Swafford*, 46 Kan. App. 2d at 329.

   B. *Any Error in Denying Speed's Request for a Witness Was Harmless*.

   Speed also claims he was denied due process because the hearing officer didn't let Speed call two witnesses: the first, inmate Charles Townsend; and second, an unnamed staff member. In ruling on an inmate's request to call witnesses, a hearing officer may balance the inmate's need for a witness against prison interests. But prison officials bear a burden of persuasion to show that there is a reasonable basis for overriding the inmate's right to call witnesses. *Sauls*, 45 Kan. App. 2d at 920; see K.A.R. 44-13-405a.

   The hearing officer first denied Speed's request that inmate Townsend testify in his defense. Speed didn't raise this issue before the district court, and typically a party can't raise an issue for the first time on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011). There are exceptions to this rule, including to serve the ends of justice or to prevent denial of fundamental rights. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

7

Speed argues that this court should decide this issue under this exception. We don't find Speed's argument persuasive. The hearing officer denied that request and cited "the [facility's] need for the prompt, efficient, and effective resolution of the disciplinary case with accurate and complete fact-finding consistent with the level of process required by law for facility disciplinary cases." K.A.R. 44-13-405a(a)(13). A hearing officer has "broad discretion in permitting or denying the witness request." K.A.R. 44-13-405a(b). And here, Speed hasn't shown that inmate Townsend was important to Speed's defense. Speed simply argues in his brief that Townsend's testimony "would have allowed 'complete fact-finding.'" We find no denial of due process in the failure to bring inmate Townsend to the hearing, which was mainly about Speed's conduct not Townsend's.

The hearing officer also denied Speed's request that an unnamed staff member testify on his behalf at the hearing. Speed presumably wanted to call this witness to testify in his defense about the charge that he violated K.A.R. 44-12-503(a) for being in a restricted area without authorization. The hearing officer denied Speed's request because he "need[ed] specific name(s) to allow scheduling for hearing."

In its motion to dismiss, the Secretary conceded that "the officer could have been readily identified by [the correctional facility's] staff." But the Secretary argued that "even if [Speed] had the requisite permission to be on the 2nd floor south, he would not have been given permission regarding his activities captured on video." Then, at the hearing on Speed's motion, the Secretary dismissed Speed's charge for violating K.A.R. 44-12-503(a) because there wasn't enough evidence to support a conviction of that charge. Since the charge related to this witness' potential testimony ultimately was dismissed, even if the hearing officer should've allowed Speed to call the witness, any error in failing to do so was harmless. See *Sauls*, 45 Kan. App. 2d at 921.

8

C. *The Hearing Officer's Findings Were Sufficient.*

Next, Speed argues that he was deprived due process because the disciplinary officer's findings were insufficient and vague. He says the hearing officer's decision was inadequate because "the findings of the hearing officer would be the equivalent of a judge concluding at a bench trial and saying 'based on everything presented I find this defendant guilty.'"

Due process does require "a written statement of the findings by the factfinders as to the evidence and the reasons for the decision." *In re Habeas Corpus Application of Pierpoint*, 271 Kan. 620, 627, 24 P.3d 128 (2001); see also *Wolff*, 418 U.S. at 563 (explaining that due process requires "a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken"). Likewise, KDOC regulations also require a written decision "that upholds, modifies, or denies the proposed action. The decision shall be concisely written and shall express the hearing officer's findings of fact and reasoning for taking the action decided upon." K.A.R. 44-6-130(b).

This is precisely what the hearing officer in Speed's case did. After the disciplinary hearing was complete, the hearing officer issued an eight-page "disposition of disciplinary case." In that disposition, the hearing officer summarized the evidence the parties had presented during the hearing. Then, at the end, the officer explained that he had relied on "video evidence, physical evidence, testimony of [Officer] Zubia, testimony of [Officer] Cory, and Offender Speed's own testimony" to find that it was more likely than not that Speed was guilty of the alleged violations.

The hearing officer's decision satisfies the due-process requirements noted in caselaw and the KDOC regulations. We find no due-process violation regarding the adequacy of the hearing officer's written decision.

9

D. *An Impartial Hearing Officer Presided over Speed's Proceedings*.

Speed's final due-process claim is that the hearing officer was not impartial because he didn't follow KDOC procedures. It's true that due process requires that an inmate who has been charged with a disciplinary violation receive an impartial hearing. See *In re Habeas Corpus Application of Pierpoint*, 271 Kan. at 627; *Washington v. Roberts*, 37 Kan. App. 2d 237, 247, 152 P.3d 660 (2007). But Speed has not shown that his hearing officer lacked impartiality.

First, there's no indication that the hearing officer failed to follow KDOC procedures. Contrary to Speed's claims, the notice of charges complied with KDOC regulations. Likewise, Speed had the chance to call witnesses in his defense. But even if the hearing officer did fail to follow regulations in some respects, prison officials have "flexibility in executing internal prison policies and procedures which are designed to preserve internal order and discipline," so "[t]he mere fact that a hearing officer in a prison discipline case has not followed [KDOC] procedural regulations does not of itself violate fundamental fairness that rises to an unconstitutional level." *Anderson v. McKune*, 23 Kan. App. 2d 803, 811, 937 P.2d 16 (1997); *Reed v. Cline*, No. 118,699, 2018 WL 4939360, at *3 (Kan. App. 2018) (unpublished opinion) (citing *Anderson*), *petition for rev. filed* November 6, 2018.

Other than his own conclusory statements, Speed simply provides no support for his position that he was denied the right to a hearing by an impartial hearing officer. Speed has failed to show a due-process violation based on the partiality of the hearing officer.

10

II. *There Was Sufficient Evidence to Support Speed's Convictions.*

Speed's next argument on appeal is that the Secretary didn't present enough evidence to support his convictions. Given the need to maintain prison security, less evidence is needed to find that an inmate has violated a prison rule than to find that a person has committed a crime. *Frost*, 44 Kan. App. 2d at 664. The prison hearing officer determines whether it is more likely than not that the prisoner has violated a prison regulation, and a court may reverse that decision only when there is not even "some evidence" supporting it. 44 Kan. App. 2d at 664. In other words, due-process requirements are satisfied if at least "some evidence" supports the prison's disciplinary decision. *Superintendent v. Hill*, 472 U.S. at 455-56; *Miller v. McKune*, 38 Kan. App. 2d 810, Syl. ¶ 3, 174 P.3d 891 (2006).

A. *Failing to Register Personal Property*

Speed first claims there wasn't sufficient evidence to support his conviction under K.A.R. 44-12-201, "Registration and use of personal property," for having two pairs of unregistered sunglasses. Under K.A.R. 44-12-201(a), each inmate is required "to make certain that any items of personal property in the inmate's possession as designated by department of corrections internal management policy and procedure or orders of the warden are properly registered." Likewise, "[e]ach inmate shall be required, upon demand, to produce any personal property registered in the inmate's name or issued to the inmate, unless previously reported lost according to proper procedure." K.A.R. 44-12-201(a).

Speed argues that "the evidence could not be considered sufficient because as charged, the items were indicated that they could not be obtained in the KDOC." He doesn't deny that his sunglasses weren't properly registered. As the Secretary points out in his appellate brief, "inmates are allowed sunglasses under Internal Management Policy and

11

Procedures 12-120." It follows, then, that Speed had to register the sunglasses in his possession. Speed also doesn't cite any caselaw or administrative regulation to support his position that an inmate can only register property that can be purchased in a Department of Corrections facility. He had two pairs of sunglasses; he didn't register them. That's sufficient evidence.

B. *Misuse of the Telephone*

Speed also claims that there wasn't sufficient evidence to support his conviction under K.A.R. 44-12-211(6) (2017 Supp.) for "us[ing] the telephone in furtherance of any illegal activity[.]" He argues that "the evidence showed that Mr. Speed and Ms. Flamik spoke about money for Mr. Speed's Islamic fund, and Ms. Flamik's essential oils business"—not for illegal activities. Speed also says "[t]he summary of audio recordings of conversations purportedly between Mr. Speed and Ms. Flamik do not indicate how the persons' voices were identified, and do not indicate clearly that the recorded conversations were made over a phone."

Here, there was ample evidence showing that Speed used the facility's phone system for illegal purposes, including the hearing officer's summaries of several audio conversations between Speed and Flamik:

- A March 8, 2017 conversation "with code words 'I'll see you early in the morning' from Janet Flamik," followed by the arrival of a contraband package the next day.
- A conversation during which Speed asked Flamik for an immediate favor and to "'run an errand for him and that she's been there a "couple of times before."'" The report notes that Flamik was at first confused during the conversation, but that she understood what Speed was requesting after Speed explained his request in different words.

12

- A conversation that took place when Flamik was in her car and explained to Speed that a security vehicle was in "'her place.'" Flamik then told Speed when the car had moved.

Although the hearing officer's written findings don't show that Speed and Flamik explicitly communicated plans to have Flamik bring him contraband, there certainly was "some" evidence that Speed was using the phones for illegal purposes. That's all that due process requires.

C. *Accessory to an Offense*

Speed also challenges the sufficiency of the evidence to convict him under K.A.R. 44-12-1101 of acting as an accessory to the offenses of another. He argues that "there cannot be sufficient evidence of this violation as it is inadequately charged to the point that it fails to state a claim." Alternatively, Speed says there's insufficient evidence because "only Inmate Townsend is shown to be carrying anything from outside the fence. . . . No evidence was shown that Mr. Speed carried anything in."

Kansas regulations define "accessory to an offense" as

"[a]iding an offender or one charged with an offense shall mean knowingly harboring, concealing, or aiding any inmate who has committed an offense, or one who has been charged with an offense, with intent that the inmate will avoid or escape from apprehension, disciplinary hearing conviction, or punishment for the offense." K.A.R. 44-12-1101(c).

Here, there's some evidence to support Speed's conviction of this allegation. For example, the hearing officer's written findings say Video 2 showed inmate Townsend "running and jumping the fence the same day a contraband package was coming in[,]" which contained the same type of contraband that Flamik "would drop." Based on these findings—especially given the rest of the evidence presented at the hearing—one could

13

reasonably believe that Speed and Townsend worked together to bring contraband into the correctional facility, an offense under K.A.R. 44-12-902 or K.A.R. 44-12-903. This same conclusion could be supported by hearing officer's written findings about Video 9, which shows Speed and two other inmates together and presumably tipping a locker off the ground. This conclusion makes even more sense when considering how, at the hearing, Speed testified that "[inmate] Livingston was operating a store. And he keeps his Debbie's and crunch right underneath the locker . . . ."

In short, although the disciplinary report didn't designate for whom Speed was acting as an accessory, there is still plenty of evidence to show that Speed committed this offense.

D. *Dangerous Contraband*

Speed's final sufficiency-of-the-evidence claim has to do with his conviction for possessing dangerous contraband in violation of K.A.R. 44-12-901. He argues that K.A.R. 44-12-901 "does not define currency as dangerous contraband." Alternatively, he says that "because the currency was not alleged to have been altered in a way to make it dangerous, and no allegation was made that the currency was capable of causing a dangerous situation," the evidence can't support a conviction for that offense.

During the disciplinary hearing, the hearing officer asked Officer Cory "about the hundred dollar bill" that Cory found in Speed's possession. Speed never denied that the bill belonged to him. The hearing officer presumably concluded there was sufficient evidence to support a dangerous contraband charge.

Under K.A.R. 44-12-901(a)(1), one of the three definitions of "dangerous contraband" is "[a]ny item . . . that is . . . capable or likely to produce or precipitate dangerous situations or conflict, and that is not issued by the department of corrections or the facilities, sold through the canteen, or specifically authorized or permitted by order of

the secretary . . . ." And under K.A.R. 44-2-103(b)(10), an inmate may not have "currency, in the form of paper, checks, money orders, coins, stamps or similar instruments with monetary value."

Looking at these definitions, the $100 bill in Speed's possession meets the definition of "dangerous contraband." Speed wasn't permitted to have cash as an inmate. Indeed, the only thing he could do with the money was participate in other activities prohibited by KDOC regulations. It's not difficult to see how having cash to use in prohibited activities could precipitate conflict in a prison and thus be dangerous. We conclude that there was sufficient evidence to support Speed's dangerous-contraband conviction.

III. *The District Court Did Not Err by Dismissing Speed's Claim that He Was Improperly Permanently Denied Visits from His Spouse.*

Next, Speed claims that the district court erred by dismissing his claim that he was improperly denied visits from Flamik, who he says is his spouse. He argues that his K.S.A. 60-1501 motion is appropriate to address this complaint because KDOC deprived him of a constitutional right—his liberty interest—by not allowing Flamik visit him in jail.

Speed's argument is based on the United States Supreme Court's decision in *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 462, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989), which holds that a State may create a liberty interest by "provid[ing] decisionmaking criteria which serve to limit discretion." In other words, a State may create a liberty interest if a regulation contains "'explicitly mandatory language,' i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow[.]" 490 U.S. at 463.

15

Speed claims that K.A.R. 44-7-104—the KDOC regulation governing inmate visitation—"contains mandatory language suggesting that there is a due process right in visitation for KDOC inmates" because it mandates that "the following procedures shall be observed by the facility in the administration of visits." He says that one of the mandatory regulations is that if a person's visitation privileges are suspended, "[t]he initial length of a suspension imposed . . . shall not exceed one year," but "shall be subject to review by the warden and may be extended for successive periods of no more than one year each." K.A.R. 44-7-104(a)(8)(A)-(B).

But Speed overlooks the part of the regulation that says "[a]ny visitor's visiting privileges *may* be suspended if the visitor violates any visitation policy and procedure . . . while in the facility . . . ." K.A.R. 44-7-104(a)(8). (Emphasis added.) Likewise, "any person may be permanently barred from entering on the grounds of any KDOC facility" if certain conditions are met. K.A.R. 44-7-104(a)(9)(A)(v) (citing K.S.A. 21-3826, which criminalizes trafficking contraband in a correctional facility). The context in which the word "may" is nearly identical to that in *Thompson*.

The prison regulation in *Thompson* said "[c]ertain visitors . . . may be excluded" for many reasons, including when "[t]he visitor's presence in the institution would . . . interfere with the orderly operation of the institution" or when "[t]he visitor is directly related to the inmate's criminal behavior." *Thompson*, 490 U.S. at 456 n.1. The *Thompson* Court held that although the regulation "contain[s] standards [that] . . . undoubtedly are intended to guide the duty officer's discretion in making the ultimate decision" of whether a visitor should be allowed admittance, it also found that the regulation "lack[ed] the requisite relevant mandatory language." 490 U.S. at 464. The Court explained the language wasn't mandatory because "the regulations are not worded in such a way that an inmate could reasonably expect to enforce them against prison officials." 490 U.S. at 465.

16

Indeed, K.A.R. 44-7-104 has the same purpose of the regulation in *Thompson*—to give officials the discretion to decide whether a person may visit an inmate in a correctional facility. Thus, we conclude that the language in K.A.R. 44-7-104, like that in *Thompson*, is not mandatory and doesn't create a liberty interest. Since Speed's liberty interest was not implicated when the KDOC banned Flamik from visiting Speed for the rest of his incarceration, the district court properly dismissed this claim.

IV. *The District Court Did Not Consider Facts Outside the Pleadings.*

As his final claim, Speed argues that the district court erred by considering facts outside the pleadings in its decision to grant the Secretary's motion to dismiss. Specifically, Speed challenges the district court's statement that it was "going to take [the Secretary] at his word, that this particular finding of this disciplinary officer is more extensive perhaps than others." Speed doesn't explain how the district court considered the Secretary's statement in its decision to dismiss his motion. Nor does he say why the Secretary's statement was prejudicial. We have a duty to review this case on appeal independently—and we have, indeed, independently reviewed whether the hearing officer's written decision was adequate. We do not find that the district court improperly relied on anything outside the record; even if it did, we have independently reviewed the same issue without doing so.

The district court's judgment is affirmed.